**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 26, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————————

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MATTHEW ALAN STACY,

    Defendant - Appellant.

No. 25-6029

———————————————————

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:24-CR-00146-R-2)**

———————————————————

Michael Pabian of Michael Pabian Law Office (Robert M. Goldstein of Law Office of Robert Goldstein, with him on the briefs), Boston, Massachusetts, for Defendant-Appellant.

Nick Coffey, Assistant United States Attorney (Elizabeth Bagwell and Steven W. Creager, Assistant United States Attorneys, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

———————————————————

Before **TYMKOVICH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

———————————————————

**PHILLIPS**, Circuit Judge.

———————————————————

Matthew Alan Stacy appeals the district court's order denying his motion to enjoin the federal prosecution against him. This criminal case arises from Stacy's use of a two-entity business structure to help his clients circumvent

Oklahoma's medical-marijuana laws. In 2018, Oklahoma legalized the possession, growth, distribution, and sale of medical marijuana. Okla. Stat. tit. 63, § 420 et seq. (2018). To lawfully operate a medical-marijuana business, an individual or entity must meet certain Oklahoma-residency requirements. *Id.* §§ 422(B)(4), 427.14(E)(7)(c) (2019).[1] These requirements form a barrier to entry for individuals and entities outside of Oklahoma.

As an attorney, Stacy centered his legal practice on out-of-state clients seeking to enter Oklahoma's medical-marijuana industry. He devised a two-entity business structure for medical-marijuana businesses that was designed to hide the true ownership interests of their out-of-state owners. In this structure, one entity obtained the required license and registration using the names of Oklahoma residents, while the other entity housed the actual medical-marijuana operations controlled by the out-of-state owners. Because of this scheme, Stacy was charged with two federal drug counts under the Controlled Substances Act, 21 U.S.C. § 801 et seq.

In the district court, Stacy moved to enjoin his federal prosecution. He argued that a congressional appropriations rider prevents the Department of Justice (DOJ) from spending funds on his prosecution. The district court held an evidentiary hearing and then denied the motion. Stacy now appeals that

---

[1] For any cited Oklahoma statute, we rely on the version in effect at the start of the timeframe alleged in the indictment for each count. Unless noted otherwise, any revisions to the relevant provisions have no material effect on this appeal.

2

denial. He argues that the district court abused its discretion by declining to enjoin his prosecution through the rider. He claims that the rider bars the DOJ from funding his prosecution, because Oklahoma's medical-marijuana laws permitted his conduct. We disagree. Because Stacy failed to substantially comply with Oklahoma's medical-marijuana laws, we conclude that his prosecution falls outside the rider's spending ban. The district court did not abuse its discretion, so we affirm.

## BACKGROUND

### I.    Legal Framework

This case deals with the interplay of federal and state marijuana laws. Before delving into the facts of this case, we review the relevant legal framework for medical marijuana under federal law and Oklahoma law.

### A.    The Federal Appropriations Rider

The Controlled Substances Act makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense" marijuana, as well as to simply possess marijuana. 21 U.S.C. § 841(a)(1); *see* § 841(b)(1)(A)(vii), (1)(B)(vii), (1)(D), (4); 21 U.S.C. § 844(a). Despite this federal prohibition, many states have legalized marijuana for medical and even recreational uses in the last few decades. *See, e.g.*, Cal. Health & Safety Code § 11362.5 (1996); Colo. Const. art. XVIII, §§ 14, 16 (2024). The states' loosening restrictions on marijuana has led to some tension between state and federal law.

3

Though marijuana remains illegal at the federal level, Congress and the DOJ have since acknowledged state-level legalization and shifted their enforcement priorities accordingly. In 2015, Congress began to enact an annual appropriations rider that bars the DOJ from using its appropriated funds to impede medical-marijuana laws at the state level. Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 538, 128 Stat. 2130, 2217 (2014). The rider currently in effect reads as follows:

> None of the funds made available under [the Appropriations] Act to the Department of Justice may be used, with respect to any of the [medical-marijuana states and territories] to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, § 531, 138 Stat. 25, 174 (2024).[2] A version of this rider has appeared in every annual appropriation since 2015.[3]

---

[2] The Full-Year Continuing Appropriations and Extensions Act, 2025 extended the rider through September 30, 2025. Pub. L. No. 119-4, § 1101(a)(2), 139 Stat. 9, 10–11 (2025). The rider is also known as the "Rohrabacher-Farr Amendment" or the "Rohrabacher-Blumenauer Amendment."

[3] Congress recently passed the One Big Beautiful Bill Act, which appropriated $3.3 billion to the DOJ for, among other things, "combat[ing] drug trafficking . . . and illegal drug use." Pub. L. 119-21, § 100054(2), 139 Stat. 72, 390 (2025). No provision of this act bars the DOJ from using the newly appropriated funds to prevent the states' implementation of their medical-marijuana laws. *See generally id.* § 10101 et seq. But the DOJ has yet to decide how to spend these funds, so the parties agree that the new funds do not affect this appeal.

**B.    Oklahoma's Medical-Marijuana Laws**

Like the Controlled Substances Act, Oklahoma's Uniform Controlled Substances Act makes it unlawful to distribute, dispense, manufacture, or possess marijuana. Okla. Stat. tit. 63, § 2-401(A)(1), (C)(2) (2019); *id.* § 2-402(A) (2019); *id.* § 2-204 (2019) (including "marihuana" as a Schedule I controlled substance). But in June 2018, Oklahoma legalized medical marijuana through a state ballot initiative. § 422 (enacted by the ballot initiative); *see Cloudi Mornings, LLC. v. City of Broken Arrow*, 454 P.3d 753, 755 (Okla. 2019). About a year later, the state legislature passed the Oklahoma Medical Marijuana and Patient Protection Act to regulate the legalized use, manufacture, and distribution of medical marijuana. Okla. Stat. tit. 63, § 427.1 et seq. (2019). These laws govern the formation and operation of medical-marijuana businesses in Oklahoma.

Under Oklahoma law, an individual seeking to establish a medical-marijuana business must have two types of authorizations:

First, the individual must receive a medical-marijuana business license from the Oklahoma Medical Marijuana Authority (OMMA). § 422(C); *see* Okla. Stat. tit. 63, § 2-302(L) (2019); § 427.14. Oklahoma law sets out various requirements for the license, including a residency requirement. § 427.14(E)(7)(c). To meet the residency requirement, "any applicant applying as an entity" must "show that seventy-five percent (75%) of all members, managers, executive officers, partners, board members or any other form of

5

business ownership are Oklahoma residents[.]" *Id.*; *see also* § 422(B)(4).[4] The application must "disclose all ownership interests" to meet this threshold. § 427.14(E)(7)(e). Those ownership interests include "any other person holding an interest or convertible note in any entity which owns, operates or manages a licensed facility[.]" Okla. Stat. tit. 63, § 427.2(46)(i) (2019). And Oklahoma law further requires that the application "be complete and accurate in every detail" with information submitted "in a full, faithful, truthful and fair manner." § 427.14(E)(4), (K). So long as the application meets the listed criteria under Oklahoma law, the OMMA must approve the license.[5] §§ 422(B), 427.14(E)(7).

Second, the individual must "obtain a registration issued by the" Oklahoma Bureau of Narcotics and Dangerous Drugs Control (OBN). § 2-302(A); *see also* § 427.14(E)(12). This registration allows the individual to manufacture, distribute, or dispense medical marijuana. § 2-302(A). Without the registration, these acts would violate the Uniform Controlled Substances

---

[4] Even before the Oklahoma legislature enacted the Oklahoma Medical Marijuana and Patient Protection Act, a medical-marijuana business had to show that "ownership of non-Oklahoma residents" did "not exceed twenty-five percent (25%)[.]" § 422(B)(4). The act later defined an Oklahoma resident as someone who has resided in Oklahoma "for at least two (2) years immediately preceding the date of application or five (5) years of continuous Oklahoma residency during the preceding twenty-five (25) years immediately preceding the date of application." § 427.14(E)(11).

[5] The Oklahoma Medical Marijuana and Patient Protection Act established the OMMA within the Oklahoma State Department of Health. Okla. Stat. tit. 63, § 427.3(A) (2019).

Act. § 2-401(A)(1), (C)(2); Okla. Admin. Code § 475:10-1-9(c) (2019). With this legal framework in mind, we turn to the facts of the case.

## II.    Factual Background

From August 2019 to at least June 2021, Stacy allegedly conspired with others to subvert Oklahoma's residency requirements for medical-marijuana businesses through a "ghost-licensing scheme." He worked with a real-estate agent to establish marijuana farms (also known as "grows") for non-Oklahoma residents. As a licensed attorney, Stacy set up a business structure designed to hide the true owners of various marijuana businesses via his law firm, Stacy Legal Group (SLG). We explain the business structure and then discuss the OBN's investigation.

### A.    The Two-Entity Business Structure

Through SLG, Stacy created a two-entity business structure to facilitate commercial medical-marijuana grows for his non-resident clients. The business structure required three steps. First, Stacy would form a limited liability company (LLC) with Oklahoma-resident ownership of at least 75% to meet the license requirements under sections 422(B) and 427.14(E). The non-resident clients would then compose the other 25% ownership interest. This LLC served as the license-holding entity (the "licensing company"). The licensing company would apply for the requisite OMMA license and OBN registration to grow medical marijuana.

7

Second, Stacy would form another LLC owned by his non-resident clients. The non-resident clients, in turn, would manage and operate the commercial medical-marijuana grow through this second LLC (the "operating company"). The operating company did not apply for either an OMMA license or an OBN registration.

Third, Stacy would set up a management agreement between the licensing company and the operating company. As part of the agreement, the licensing company would grant the operating company (1) sole responsibility "for the lawful and profitable growth, cultivation, harvest, and production of marijuana," Supp. App. at 31; (2) the right to sell the marijuana production; and (3) "[a] management fee" equal to 100% of the revenue generated by the sale of the grown marijuana, *id.* at 37. In exchange, the operating company would pay an annual fee of up to $15,000 to the licensing company. The proceeds from this annual fee compensated the Oklahoma residents in the licensing company.

Stacy repeatedly set up this two-entity business structure for his out-of-state clients. In the license applications, he would often recycle the same Oklahoma residents to reach the required 75% threshold. For example, one Oklahoma resident, Helen Carrillo, was involved in the formation of over sixty licensing companies. The Oklahoma residents typically had little to no knowledge of the marijuana operations. *See, e.g.*, Supp. App. at 145 (Kylie Kennedy testifying that she consented to the use of her name for only one license application, even though Stacy used her name for additional

8

applications); *id.* at 156–57 (Crystal Huynh testifying that she never consented to Stacy's using her name on a license application); *id.* at 221–22 (Helen Carrillo stating that, other than receiving $5,000 for Stacy's using her name in each license, she was "out of it completely"). Stacy did not disclose the two-entity business structure to the OMMA or OBN when applying for licenses and registrations on behalf of the licensing companies.

### B.    The OBN Investigation

Stacy's two-entity licensing scheme caught the attention of OBN agents. In 2018, OBN agents began to investigate irregularities with certain OBN registrations. An agent had noticed that multiple OBN registrations listed the same address in Blanchard, Oklahoma. That address consisted of an empty field located across the street from Stacy's residence. Further investigation revealed that over 100 OMMA licenses listed that address. These irregularities led to (i) OBN searches of the marijuana-grow sites, (ii) an investigation of the property that Stacy leased to a grow client, and (iii) meetings between Stacy and the OBN. We describe these events below.

### 1.    Searches of Marijuana Grows

Starting in 2020, the OBN searched various properties that Stacy's clients used to cultivate marijuana. At multiple properties, OBN agents discovered that the grows violated Oklahoma law. In June 2020, OBN agents executed a search warrant on King Happy Farms, the grow operations for one of Stacy's clients.

9

They seized 14,776 marijuana plants and found evidence of human trafficking. At that time, King Happy Farms did not possess an OBN registration.

During the search, OBN Chief Agent Williams called Stacy to tell him that a commercial grow operation needed both an OMMA license and an OBN registration. He told Stacy that growing marijuana without an OBN registration violated criminal drug laws. Stacy also spoke to OBN's general counsel by phone. The general counsel likewise advised Stacy that growing marijuana without an OBN registration or OMMA license was a criminal violation. That same day, Stacy applied for King Happy Farms's OBN registration, which OBN granted about a month later. Despite his conversations with Agent Williams and the general counsel, Stacy still advised at least one client that she could grow marijuana before receiving an OBN registration. *See* Supp. App. at 189–90 (informing client Guan Rong Yang that she could grow marijuana with only a grower license).

Between July 2020 and March 2021, OBN agents searched other marijuana grows associated with Stacy. *See, e.g.*, App. vol. V, at 64–70 (Ping Two, LLC, July 2020), 175–77 (Lama Green LLC, December 2020); Supp. App. at 246–47 (Zhical Green LLC, March 2021). The agents' searches typically yielded the same information: they found marijuana growth before the companies obtained OBN registrations and a failure to comply with required

10

security measures. The agents cited most violations as administrative violations but flagged a few as criminal violations.[6]

### 2. Property Leased to a Grow Client (X Fortune Inc.)

Besides providing legal counsel, Stacy served as the landlord for a marijuana-grow client. In September 2020, Stacy leased a property located in Blanchard to X Fortune Inc. for its medical-marijuana grow business. The lease stipulated that the property could be used for "any lawful purpose," App. vol. VI, at 1, but advised that the cultivation, production, and sale of marijuana was illegal under federal law, *id.* at 15. The lease also acknowledged that the property was to "be used by [the] Tenant to carry out a lawful cannabis related business in accordance with Oklahoma marijuana law and regulations[.]" *Id.* at 16. X Fortune never received the appropriate OMMA license but began growing marijuana on the leased property anyway. One of the tenants testified that Stacy knew about the marijuana grow on the property and knew that they had no license.

### 3. Meetings with OBN

By February 2021, the OBN had inspected several grows that listed Helen Carrillo as the owner of the licensing companies. But at those inspections, the

---

[6] At the evidentiary hearing, Chief Agent Williams explained that administrative violations are "not mutually exclusive of criminal investigation." App. vol. III, at 261. He stated that various reasons may cause agents to initially cite a criminal violation as an administrative one, such as low personnel numbers at a search, the need for further investigation, or not wanting to alert the target of a criminal investigation. *Id.*

11

grow-site workers did not know who Carrillo was. The OBN agents discovered that, apart from the initial applications for OMMA licenses, Carrillo was not involved in any of the grows.

On March 1, 2021, OBN agents spoke with Carrillo about her role in the various marijuana grows. Carrillo had little information about the grows and was surprised by the number of licenses listing her as the owner. She stated that she merely received a $5,000 payment for each license that used her name. Toward the end of the meeting, the OBN agents spoke with Stacy over the phone, during which Stacy shared his two-entity business structure with the agents. After Stacy disclosed this information, an agent requested that he inform the OBN's general counsel of this structure.

Stacy met with the OBN's general counsel on May 11, 2021. The general counsel informed Stacy that the OBN regarded his two-entity business structure as illegal. In a follow-up letter, the general counsel stated that the operating companies needed OBN registrations to legally grow marijuana. The general counsel then explained that none of these companies qualified for OBN registrations if they were ineligible for OMMA licenses. On May 21, 2021, Stacy met with the general counsel again and presented alternate business structures for OBN's consideration. But the general counsel rejected each proposal. The general counsel reiterated that the two-entity business structure failed to meet the requirements for OBN registration. After additional communications and at least one other meeting in June 2021, the OBN began

denying registrations for Stacy's clients because of the two-entity structure and falsified information in the application.

## III.    Procedural Background

In October 2022, Oklahoma filed criminal charges against Stacy. The amended information and second amended information contain a combined thirty-four felony charges, including for manufacturing a controlled dangerous substance, offering a false or forged instrument for record, and conspiracy to defraud the state. Many of these charges focus on Stacy's two-entity business structure, his failure to disclose all ownership interests, and his attempts to circumvent the OMMA-license and OBN-registration requirements. Stacy later demurred to the evidence, arguing that the two-entity business structure complied with Oklahoma law and that the evidence was insufficient to find guilt. The Oklahoma trial court disagreed with Stacy and denied the demurrer. The state charges remain pending against him, with a jury trial set for January 2026.

Then in April 2024, a federal grand jury returned an indictment against Stacy.[7] The indictment charged him with a drug conspiracy, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) and 18 U.S.C. § 2; and maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(2), (b). His federal charges arise from the same core facts as his state charges—namely, his two-entity business

---

[7] The same indictment also charged two of Stacy's co-conspirators—Chong Iu Phu and Chanh Iu Phu.

structure, his failure to disclose all ownership interests, and his attempts to evade Oklahoma's licensing and registration requirements.

Stacy moved for the district court to enjoin his federal prosecution. He argued that the rider barred the DOJ from spending funds to prosecute him. The government opposed this motion. It countered that the district court lacked jurisdiction to enjoin the prosecution, that the rider prohibits suits against only state actors, and that Stacy had failed to comply with state law (as required to activate the rider's spending ban). After holding an evidentiary hearing, the district court denied the motion. As a threshold matter, the district court determined that the rider conferred jurisdiction over Stacy's request to enjoin the prosecution. But on the merits of the motion, the district court concluded that Stacy had failed to prove "by a preponderance of the evidence that he complied with Oklahoma state law."[8] App. vol. II, at 9; *see id.* at 11, 15.

First, for the drug-conspiracy charge, the district court determined that Stacy had failed to substantially comply with Oklahoma law. Specifically, the district court found that Stacy never disclosed the two-entity business structure to OMMA, that the operating companies fell short of the 75% residency requirement, and that his clients began growing marijuana without OBN registrations.

---

[8] The district court assumed that the rider applied to individual prosecutions because the motion failed from Stacy's lack of state-law compliance anyway.

Second, for the charge of maintaining drug-involved premises, the district court also determined that Stacy had not complied with Oklahoma law. The court reasoned that Stacy had failed to "cast doubt" on the allegation that he intentionally rented his property for an unlicensed marijuana grow. *Id.* at 15. The district court therefore declined to enjoin the prosecution.[9]

Stacy timely filed an interlocutory appeal. The district court stayed the prosecution pending this appeal.

## STANDARD OF REVIEW

We review the district court's denial of an injunction for an abuse of discretion. *See United States v. McVeigh*, 157 F.3d 809, 814 (10th Cir. 1998); *EagleMed LLC v. Cox*, 868 F.3d 893, 899 (10th Cir. 2017). Under this standard, we must "examine the court's factual findings for clear error and its legal conclusions de novo." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796–97 (10th Cir. 2019); *see United States v. Sirois*, 119 F.4th 143, 151–52 (1st Cir. 2024) (reviewing the denial of a motion to enjoin a federal prosecution under the same standard).

---

[9] The government also challenged Stacy's standing to seek an injunction against his federal prosecution. The district court concluded that Stacy had standing, and no party argues otherwise on appeal. We have an independent duty to ensure that litigants have Article III standing on appeal, and here, we conclude that Stacy satisfies the requirements for standing. *See United States v. Hays*, 515 U.S. 737, 742 (1995); *United States v. McIntosh*, 833 F.3d 1163, 1173–74 (9th Cir. 2016).

We also review de novo any jurisdictional challenges and questions of statutory interpretation. *United States v. Gulley*, 130 F.4th 1178, 1183 (10th Cir. 2025); *Smith v. Bd. of Governors of the Fed. Rsrv. Sys.*, 73 F.4th 815, 820 (10th Cir. 2023).

## DISCUSSION

On appeal, Stacy argues that the district court abused its discretion by denying his motion to enjoin the prosecution. His arguments fall into two camps—(1) jurisdictional challenges, and (2) the merits of the requested injunction. For the jurisdictional challenges, the parties dispute both our jurisdiction over this appeal and the district court's jurisdiction over the initial motion. And on the merits, Stacy argues that the rider protects against the funding of individual prosecutions and that he falls within that protection as someone who complied with Oklahoma's medical-marijuana laws. We start with the jurisdictional challenges and then consider the merits of this appeal.

## I.    Jurisdictional Challenges

The government raises two jurisdictional challenges to this appeal. First, the government asserts that we lack jurisdiction to review the district court's order denying the motion to enjoin the prosecution. Second, regardless of our jurisdiction, the government argues that the district court lacked jurisdiction to hear Stacy's initial motion. We address each jurisdictional issue in turn.

A.    **We have jurisdiction under 28 U.S.C. § 1292(a)(1).**

To start, the government challenges our jurisdiction to hear this appeal. Stacy, in turn, contends that we have jurisdiction under § 1292(a)(1). We agree with Stacy and therefore exercise jurisdiction over this appeal.[10]

Under § 1292(a)(1), we have jurisdiction over appeals from "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions[.]" § 1292(a)(1). "If the order in question is clearly injunctive in nature, the statute provides a vehicle for immediate appeal without further inquiry." *McVeigh*, 157 F.3d at 813; *see also Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 (10th Cir. 1989) ("[A]n interlocutory order expressly granting or denying injunctive relief fits squarely within the plain language of section 1292(a)(1)."). Here, Stacy moved to enjoin his federal prosecution, and the district court denied that injunction. The district court's order is "injunctive in nature," *McVeigh*, 157 F.3d at 813, so this appeal falls within § 1292(a)(1) as an appeal of an interlocutory order refusing an injunction.

The government argues otherwise, asserting that § 1292(a)(1) does not apply to criminal cases. As support, the government cites *Miller v. United States*, in which the Second Circuit expressed "doubt" about "whether

---

[10] The parties also dispute whether we may exercise jurisdiction under 28 U.S.C. § 1291 through the collateral-order doctrine. Because we conclude that we have jurisdiction under § 1292(a)(1), we do not consider this issue.

§ 1292(a)(1) applies to criminal cases at all." 403 F.2d 77, 78 (2d Cir. 1968).

Drawing from this statement, the government claims that, despite the merger of

law and equity, the "historic wall" between courts of equity and criminal courts

still bars our jurisdiction under § 1292(a)(1).[11] Resp. Br. at 20. But the

government's argument is foreclosed by our case law. In *McVeigh*, a criminal

defendant appealed a district court's order, which had rescinded certain

restrictions on federal-state cooperation in a criminal investigation. 157 F.3d at

811. Because we determined that the district court's order "had the effect of

modifying or dissolving a previously imposed injunction," we concluded that

we had jurisdiction under § 1292(a)(1) for a criminal interlocutory appeal. *Id.*

---

[11] The government cites *Schoenamsgruber v. Hamburg American Line*, 294 U.S. 454 (1935), and *Di Bella v. United States*, 369 U.S. 121 (1962), for the proposition that Congress had authorized interlocutory appeals for only suits in equity, not criminal cases. But the merger of law and equity through the Federal Rules of Civil Procedure has severely eroded the applicability of *Schoenamsgruber*. *See Farrell Lines Inc. v. Ceres Terminals Inc.*, 161 F.3d 115, 116 (2d Cir. 1998) (noting that *Schoenamsgruber*'s limitation on injunctions in admiralty was undermined by "[t]he unification of admiralty and other civil actions," which "impelled several circuits to abandon the prior limitation and recognize the authority of district courts, sitting in admiralty, to issue injunctions"). And though *Di Bella* described statutory exceptions to the final-judgment rule (including § 1292(a)(1)) as "addressed either in terms or by necessary operation solely to civil actions," that case contained no analysis beyond this bare reference. 369 U.S. at 125–26. Without more persuasive authority, we decline to favor a line of dicta over the plain language of § 1292(a)(1), which contains no provision limiting injunctions to civil cases. *Contra* § 1292(b) (expressly limiting subsection (b) to "civil action[s]"). These outdated references to the courts' equitable powers do not persuade us that we lack jurisdiction to hear this appeal.

at 813. Given our precedent, we decline to recognize any blanket prohibition on applying § 1292(a)(1) to criminal cases.[12]

But we acknowledge that the government correctly taps into the courts' reluctance to expand the use of interlocutory appeals in criminal cases. Courts have generally applied finality requirements more strictly in criminal cases than in civil cases. 15B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3918 (2d ed. 2025). This emphasis on finality derives from the Supreme Court's view that the "encouragement of delay is fatal to the vindication of the criminal law." *Cobbledick v. United States*, 309 U.S. 323, 325 (1940). These background principles in the finality context "support [the]

---

[12] The government acknowledges *McVeigh* but tries to limit its reach. According to the government, "when modifications have been sought after judgment in criminal cases," our case law "has held that such orders [granting or denying the modification] have sufficient finality to permit appeal under 28 U.S.C. § 1291." Resp. Br. at 21 n.5. As support, the government cites two cases that deal with requests to modify an imposed sentence. *Id.* (citing *United States v. Washington*, 759 F.3d 1175, 1180–81 (10th Cir. 2014); *United States v. Begay*, 631 F.3d 1168, 1169 (10th Cir. 2011)). The defendant in *Washington* appealed the district court's denial of his request to modify his term of imprisonment, 759 F.3d at 1178–79 (citing 18 U.S.C. § 3582(c)), while the defendant in *Begay* appealed the district court's modification of his supervised-release conditions, 631 F.3d at 1169 (citing 18 U.S.C. § 3583(e)(2)). But neither *Washington* nor *Begay* involved an injunction. Instead, the requested modifications in those cases would have altered the final criminal judgment. *See Dolan v. United States*, 560 U.S. 605, 617–18 (2010) (citing §§ 3582(b), 3583(a)) (stating that a term of imprisonment and supervised release are part of the final judgment). The district courts' orders in *Washington* and *Begay* therefore had sufficient finality to fall under § 1291. By contrast, an order denying an injunction does not necessarily deal with any sort of final judgment. For these reasons, the government's attempt to distinguish this case from *McVeigh* fails.

narrow application of § 1292(a)(1)" in criminal cases. Federal Practice and Procedure § 3918. In line with this mandate, other circuit courts have hesitated to apply § 1292(a)(1) to criminal interlocutory appeals. *See Miller*, 403 F.2d at 78 (2d Cir. 1968) (expressing doubt about the application of § 1292(a)(1) to criminal cases); *In re Search Warrants Issued Feb. 18, 2022*, 111 F.4th 316, 318–19, 323–24 (4th Cir. 2024) (concluding that the court of appeals lacked jurisdiction under § 1292(a)(1) to review the district court's interlocutory order denying a search-warrant target's request to enjoin the government from searching records seized in a criminal investigation).

Yet even against this cautious application of § 1292(a)(1), the First and Ninth Circuits have exercised jurisdiction over interlocutory appeals under circumstances like this case. *See, e.g.*, *United States v. McIntosh*, 833 F.3d 1163, 1170–72 (9th Cir. 2016); *United States v. Bilodeau*, 24 F.4th 705, 711–12 (1st Cir. 2022). In both *McIntosh* and *Bilodeau*, the defendants argued that the rider prohibited the government from funding their federal prosecutions, because the prosecutions prevented the states from implementing laws on medical marijuana. 833 F.3d at 1168; 24 F.4th at 708, 711. They asserted that the district courts erred by failing to enjoin their prosecutions. *McIntosh*, 833 F.3d at 1168, 1170; *Bilodeau*, 24 F.4th at 711. The First and Ninth Circuits noted that federal appellate jurisdiction typically requires a final decision, which exists only "after conviction and imposition of a sentence." *Bilodeau*, 24 F.4th at 712 (citation modified); *see McIntosh*, 833 F.3d at 1170. But both

circuits recognized that, because of the rider, these appeals fell "outside the ordinary rule" that would otherwise limit their jurisdiction. *Bilodeau*, 24 F.4th at 712; *see McIntosh*, 833 F.3d at 1172–73. The Ninth Circuit determined that, "[e]ven if [the defendants] cannot obtain injunctions of their prosecutions themselves, they can seek—and have sought—to enjoin DOJ from *spending funds* from the relevant appropriations acts on such prosecutions" under the rider. *McIntosh*, 833 F.3d at 1172. The First Circuit similarly reasoned that "the alleged wrong is not the prosecution per se, but rather the use of federal funds in a manner that prevents the implementation of [the state]'s medical marijuana laws." *Bilodeau*, 24 F.4th at 712. So both circuits concluded that they had jurisdiction under § 1292(a)(1) to review the district courts' interlocutory orders denying injunctive relief. *Id.* at 711–12; *McIntosh*, 833 F.3d at 1172.

We face the same situation here. Like the defendants in *McIntosh* and *Bilodeau*, Stacy alleges that the rider bars the government from funding his prosecution and seeks to enjoin that spending. He also claims that he "fully complied with Oklahoma's medical marijuana laws" and that "this prosecution violates the [rider] and the Appropriations Clause." Op. Br. at 2. Importantly, defendants seeking to enjoin their federal prosecutions under the rider face a distinct need for immediate appeal. Any decision to delay an appeal until after the final judgment would result in additional funds for the prosecution through a potential conviction and sentencing. Without an interlocutory appeal, a defendant would have no recourse for the government's continued-spending

21

violation should the district court err in denying an injunction—"the funds will be spent and cannot be unspent." *Bilodeau*, 24 F.4th at 712. Because we find the First and Ninth Circuits' reasoning on this issue persuasive, we likewise conclude that we may exercise jurisdiction under § 1292(a)(1).

Finally, the government argues that, even if we could exercise jurisdiction under § 1292(a)(1) in some criminal appeals, we should not do so here. According to the government, a court order that "relates only to the conduct or progress of litigation before that court ordinarily is not considered an injunction and therefore is not appealable under § 1292(a)(1)." Resp. Br. at 22 (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988)). The government claims that Stacy's requested injunction falls within *Gulfstream Aerospace*'s dictate against interlocutory appeals. We disagree.

*Gulfstream Aerospace* dealt with an order denying a motion to stay the case, not an injunction. 485 U.S. at 272. In that context, the Supreme Court held "that orders granting or denying stays of 'legal' proceedings on 'equitable' grounds are not automatically appealable under § 1292(a)(1)." *Id*. at 287. But the Court elaborated that its ruling would "not prevent interlocutory review of district court orders when such review is truly needed." *Id*. The Court emphasized that "[§] 1292(a)(1) [would] . . . continue to provide appellate jurisdiction over orders that grant or deny injunctions[.]" *Id*. Unlike the party in *Gulfstream Aerospace*, Stacy seeks review of an order denying an injunction,

22

not a stay. *See id.* at 273; *Bilodeau*, 24 F.4th at 711 n.6 (stating that motions to "prevent[] the DOJ from spending federal funds to continue [the defendants'] prosecution" should be construed as "requests for injunctions"). His requested injunction fits squarely within the scope of appealability allowed under *Gulfstream Aerospace*. 485 U.S. at 287–88.

We also reject the government's contention that the district court's order relates to only the conduct or progress of the litigation before the district court. Rather, the order deals with whether the rider bars the DOJ from spending funds on Stacy's prosecution. That issue is separate from the pace or merits of the criminal proceedings against Stacy. *See Bilodeau*, 24 F.4th at 712; *McIntosh*, 833 F.3d at 1172. *Gulfstream Aerospace* lends no support to the government's position.

For these reasons, we conclude that we have jurisdiction under § 1292(a)(1) to resolve this appeal.

## B.    The district court had ancillary jurisdiction over the motion to enjoin the prosecution.

Next, the government challenges the district court's jurisdiction over Stacy's initial motion to enjoin the prosecution. The government contends that Stacy failed to meet his jurisdictional burden in the district court.[13]

---

[13] Relatedly, the government argues that injunctive relief requires the filing of a separate civil complaint, even if the injunction pertains to a criminal prosecution. The government relies on an unpublished case, which included a footnote stating that, "[a]bsent a properly-filed complaint, a court lacks power

*(footnote continued)*

23

In particular, the government claims that Stacy faces a "virtually impossible" burden, because "'centuries of weighty experience in Anglo-American law' [establish] that 'equity will not enjoin a criminal prosecution.'" Resp. Br. at 48 (quoting *Stefanelli v. Minard*, 342 U.S. 117, 120 (1951)). This statement mischaracterizes the law. Though the Supreme Court disfavors injunctions in criminal prosecutions, federal courts have established that certain "rare" exceptions justify extending their equitable jurisdiction to criminal

---

to issue preliminary injunctive relief." *Powell v. Rios*, 241 F. App'x 500, 505 n.4 (10th Cir. 2007). We disagree with this argument. In *Powell*, a pro se prisoner tried to move for a temporary restraining order due to alleged civil rights violations in the prison but had no underlying civil action. *Id.* at 502. The magistrate judge therefore directed the plaintiff to file a complaint with his motion. *Id.* But the injunctive relief in *Powell* concerned a civil proceeding, not a criminal proceeding. *Id.* There, no underlying case existed for the prisoner to request injunctive relief; a freestanding motion for relief cannot commence a civil action. *Id.* at 502, 505 n.4; *see* Fed. R. Civ. P. 3. By contrast, an underlying criminal case exists here, and the request to enjoin the criminal prosecution falls within that case.

True, criminal defendants have filed requests to enjoin their federal prosecutions as separate civil actions, rather than as motions in the original criminal cases. *See, e.g.*, *Deaver v. Seymour*, 822 F.2d 66, 66–67 (D.C. Cir. 1987). But *United States v. Schnitzer* highlights how a civil-action requirement would amount to a mere administrative exercise. 567 F.2d 536 (2d Cir. 1977). In *Schnitzer*, a defendant moved to expunge his arrest record. *Id.* at 538. He filed his motion in his original criminal case instead of commencing a new civil case. *Id.* After an unfavorable ruling from the district court, he argued on appeal that his failure to file a separate civil action stripped the district court of jurisdiction. *Id.* The Second Circuit disagreed, reasoning that even if the defendant had filed a separate civil action, the case "would have been assigned to the same judge as a matter related to the criminal action and would have been treated as ancillary to the criminal action." *Id.* Likewise, had Stacy filed a separate civil action to enjoin the prosecution, that civil action would have been treated as a related matter and likely assigned to the same district judge overseeing the criminal case. For these reasons, the government's argument is unpersuasive.

cases. *McIntosh*, 833 F.3d at 1172; *see, e.g.*, *Truax v. Raich*, 239 U.S. 33, 37–38 (1915) (recognizing that "equitable jurisdiction exists to restrain criminal prosecutions" in some cases). Moreover, *Stefanelli* is easily distinguishable, as it involved attempts to interfere in separate state-court criminal proceedings by asking federal courts to suppress evidence in those proceedings. *See* 342 U.S. at 120 (noting that appeal concerned "perhaps the most sensitive source of friction between [s]tates and [n]ation, namely, the active intrusion of the federal courts in the administration of the criminal law for the prosecution of crimes solely within the power of the [s]tates"). No such federalism concerns are at play here.

Instead, this issue turns on separation-of-powers concerns. Under the Appropriations Clause, "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law[.]" U.S. Const. art. I, § 9, cl. 7. "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). This clause forms a cornerstone for the separation of powers, especially between the executive and legislative branches. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012). Otherwise, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure." *McIntosh*, 833 F.3d at 1175 (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 1348 (3d ed. 1858)); *see also Bilodeau*, 24 F.4th at 712 ("[T]he defendants stand not so much as criminal defendants seeking to vindicate a personal right but as

25

parties with a particularly concrete interest in seeing a congressional spending ban vindicated.").

These separation-of-powers principles underlie any alleged violation of the rider. The rider bars the DOJ from spending appropriated funds in a manner that prevents a state from implementing its medical-marijuana laws. Consolidated Appropriations Act, 2024 § 531. Here, Stacy argues that the DOJ violated the rider by using funds to prosecute him despite his compliance with Oklahoma's medical-marijuana laws. Faced with that argument, the district court could not "ignore the judgment of Congress, deliberately expressed in legislation"—here, the appropriations rider. *McIntosh*, 833 F.3d at 1172 (quoting *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001)). And it did not need to ignore such legislative judgment because "district courts in criminal cases have ancillary jurisdiction, which 'is the power of a court to adjudicate and determine matters incidental to the exercise of its primary jurisdiction over a cause under review.'" *Id.* at 1172 n.2 (quoting *United States v. Sumner*, 226 F.3d 1005, 1013–15 (9th Cir. 2000)); *cf. United States v. Wingfield*, 822 F.2d 1466, 1470 (10th Cir. 1987) (holding that district court had ancillary jurisdiction over dispute between state and federal claims to property forfeited in criminal prosecution).

We therefore conclude that the district court properly exercised its ancillary jurisdiction. To hold otherwise would render the rider effectively

26

unenforceable.[14] *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 226 (2015) (requiring us to construe statutes to avoid making any clause "superfluous, void, or insignificant" (citation modified)).

## II.    Merits Issues

Now that we have resolved the jurisdictional issues, we turn to the merits of Stacy's appeal. On the merits, the parties advance two issues: (1) whether the rider bars the DOJ from funding the prosecutions of private individuals (rather than only state actors), and (2) whether the district court abused its discretion by denying Stacy's motion to enjoin the prosecution. We address each issue below.

---

[14] We reject the government's suggestion that a defendant could enforce the rider via a motion to dismiss the indictment. According to the government, a defendant may move to dismiss the prosecution under Federal Rule of Criminal Procedure 48(b)(3) because the defendant would face "unnecessary delay" for a trial if the government had no funds to prosecute the case. Resp. Br. at 51 (citation modified). We disagree. The government's argument presumes that the DOJ can regulate its own funding without any judicial oversight. To reach the threshold for dismissal, the government would first have to independently decide to defund the prosecution. The court would then need to wait the requisite period of delay to warrant dismissal under Rule 48(b). *See United States v. Barken*, 412 F.3d 1131, 1136 (9th Cir. 2005) (stating that a dismissal under Rule 48(b) is warranted for a delay of nearly five years between the defendant's arrest and trial "only in extreme circumstances" and after the district court "exercis[ed] caution and . . . forewarn[ed] the government of the consequences of further delay"). This proposed remedy imputes complete discretion to the DOJ to determine which prosecutions fall outside the rider's scope and thus does not resolve the separation-of-powers concern at issue here.

27

**A.     The rider bars the DOJ from spending appropriated funds to prosecute private individuals who comply with state medical-marijuana laws.**

The parties dispute whether the rider applies to the prosecutions of private individuals. Stacy contends that the rider bars the DOJ from funding the prosecutions of private individuals who comply with state medical-marijuana laws. He argues that these prosecutions deter conduct authorized under state law and thus "prevent" the states "from implementing their" medical-marijuana laws. Op. Br. at 38 (quoting *McIntosh*, 833 F.3d at 1176). The government claims that the rider bars the prosecutions of only state officials who "implement" a state's medical-marijuana laws. Under this reading of the rider, the government asserts that a private individual does not "implement" state law and that prosecutions of private individuals therefore fall outside the rider's scope.

To resolve this issue, we start with the text of the rider. The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 996 (10th Cir. 2019) (citation modified). "If the statute's text is unambiguous, then its plain meaning controls, and our inquiry ends." *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021). As a reminder, the rider states as follows:

> None of the funds made available under [the Appropriations] Act to the Department of Justice may be used, with respect to any of the [medical-marijuana states and territories] to prevent any of them

28

from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated Appropriations Act, 2024 § 531. We construe these words in the context of the rider. *See Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) ("Statutory language cannot be construed in a vacuum." (citation modified)).

The parties focus on the phrase "to prevent any of them from implementing their own laws." We dissect the key words:

- "Prevent" means "to keep from happening or existing." *Prevent*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/prevent (last visited Aug. 14, 2025).

- "Them" refers to all the states and territories that have legalized medical marijuana. *See* Consolidated Appropriations Act, 2024 § 531.

- "Implement" means "carry out, accomplish," as well as "to give practical effect to and ensure of actual fulfillment by concrete measures." *Implement*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/implement (last visited Aug. 14, 2025).

- "Their own laws" refer to the states' medical-marijuana laws. *See* Consolidated Appropriations Act, 2024 § 531.

Reading the phrase together, the DOJ may not use funds "to keep" the states from "carry[ing] out" or "giv[ing] practical effect" to their medical-marijuana laws. *See Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1291 (10th Cir. 2024) (stating that the plain and ordinary meaning of the language in a statute can be determined through dictionary definitions). Relevant here, the federal Controlled Substances Act makes medical marijuana illegal, while the states referred to in the rider permit medical marijuana in some capacity. If the DOJ were to prosecute individuals under federal law for conduct that complies with

state law, these prosecutions would deter the state-authorized use of medical marijuana and cumulatively prevent the state from giving "practical effect" to its laws. That conflicts with the rider's prohibition against the DOJ's use of funds to prevent the states from implementing their own medical-marijuana laws. So from the plain language, we conclude that the rider bars the prosecutions of private individuals who comply with state medical-marijuana laws.

Our conclusion comports with every other court's reading of the rider. *See, e.g.*, *McIntosh*, 833 F.3d at 1176–77 (holding that the rider bars the DOJ from funding the prosecutions of those engaged in conduct permitted under state medical-marijuana laws); *Bilodeau*, 24 F.4th at 712–13 (same); *United States v. Jackson*, 388 F. Supp. 3d 505, 507 (E.D. Pa. 2019) (same). And we have characterized the rider in similar terms as well. *See Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111, 1114 (10th Cir. 2017) (describing the rider as "defunding the Justice Department's prosecution of the exchange of medical marijuana where it is legal under state law"); *Sandusky v. Goetz*, 944 F.3d 1240, 1242–43 (10th Cir. 2019) (same). The government makes several arguments against this reading of the rider. None are persuasive.

First, the government touts how the rider identifies the states and territories that have legalized medical marijuana. Relying on this list, the government argues that Congress had intended "to only protect state actors, not private individuals[.]" Resp. Br. at 54. But the government imputes too much

30

meaning to the list of states without acknowledging the rest of the rider. Though the rider protects these states from DOJ spending that would "prevent" the states from "implementing their own laws," the rider never suggests that only direct interference with a state actor falls within the spending ban. The rider's focus on these medical-marijuana states does not circumscribe the scope of the rider's protection.

Second, the government argues that the word "implement" shows that the rider protects state actors, not private actors. As support, the government cites *Bowsher v. Synar*, which says that "[i]nterpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." 478 U.S. 714, 733 (1986). According to the government, because *Bowsher* equates "executing" the law with "implementing" the law, the power to "implement" the law rests with the executive and so the rider deals with only state actors. But *Bowsher* never held that "execution" is the sole definition of "implementation." *Bowsher* stated that "execution of the law" includes "[i]nterpreting a law enacted by Congress to implement the legislative mandate[.]" *Id.* (citation modified). That definition does not foreclose the existence of other definitions for "implement," nor does *Bowsher* suggest that the meaning of "implement" is strictly identical to that of "execute." We fail to see how *Bowsher* constricts the plain language of the rider in the manner advocated for by the government.

Third, the government argues that Oklahoma law reinforces its interpretation of the rider. The government points to the Oklahoma constitution, which tasks "the Executive Branch of Government with the responsibility to *implement* all measures enacted by the Legislature." Okla. Stat. tit. 75, § 250.2(A) (emphasis added); *see generally* Okla. Const. art. VI. According to the government, Oklahoma law specifically authorizes the Oklahoma State Department of Health to "implement" the state's medical-marijuana laws. Okla. Stat. tit. 63, § 427.3(C) (2019). The government claims that these examples demonstrate that only state actors "implement" the law. But again, the government assumes that, to "prevent" a state from implementing its medical-marijuana laws, the DOJ must directly interfere with a state actor. This interpretation overlooks the broader scope of actions from the DOJ that may still prevent a state from implementing its laws. For example, here, the DOJ's prosecution of individuals who comply with state law would undermine any state-level legalization of medical marijuana. These types of prosecutions prevent that state from "implementing," or "giving practical effect to," its own laws. The government's position creates a protection too narrow for the rider's plain language.

Fourth, the government criticizes *McIntosh*'s analysis of the rider's plain language. The government claims that the Ninth Circuit merely reached its desired outcome by substituting "implementing" with "giving practical effect to." *See McIntosh*, 833 F.3d at 1176. But the Ninth Circuit's analysis used

32

traditional tools of statutory interpretation. *See Rocky Mountain Wild*, 98 F.4th at 1291 ("Dictionary definitions are useful touchstones to determine the 'ordinary meaning' of an undefined statutory term." (citation modified)). And the government adopts the same mode of analysis that it criticizes—substituting "implementing" with "executing" to support its interpretation of the rider as cabined to the prosecutions of state actors. This argument fails to convince us that we should diverge from the Ninth Circuit's reading of the rider.

For these reasons, we conclude that the rider bars the DOJ from spending appropriated funds to prosecute private individuals who comply with state medical-marijuana laws.

**B.    The district court did not abuse its discretion in denying Stacy's motion to enjoin the prosecution.**

Finally, Stacy insists that he complied with Oklahoma's medical-marijuana laws, such that the government's funding of the prosecution against him violates the rider. He claims that his compliance required the district court to enjoin the prosecution of both the drug-conspiracy count and the count for maintaining drug-involved premises. The district court disagreed. On both counts, the district court concluded that Stacy's underlying conduct fell short of substantial compliance with Oklahoma law. The district court therefore declined to enjoin the prosecution.

To fall within the rider's protection, the moving party must prove by a preponderance of the evidence that he complied with the state's medical-

marijuana laws. *See United States v. Evans*, 929 F.3d 1073, 1077 (9th Cir.

2019); *Sirois*, 119 F.4th at 152–53. As a threshold matter, the parties dispute

the level of state-law compliance that Stacy must demonstrate under the rider.

Stacy asserts that he needs to show just a reasonable belief that his actions

complied with state law. No court has ever adopted this standard of compliance,

and we likewise reject such a lenient standard. Alternatively, Stacy argues that

the rider protects individuals who substantially comply with state law. *See*

*Sirois*, 119 F.4th at 148, 153 (holding that the party moving to enjoin the

prosecution under the rider must show at least substantial compliance with state

law).[15] The government counters that we should instead follow the Ninth

Circuit's strict-compliance standard. *McIntosh*, 833 F.3d at 1178 (holding that

the rider protects only those who strictly comply with state law). We need not

---

[15] The First Circuit has yet to explicitly adopt a standard of compliance. In *Bilodeau*, the First Circuit rejected the Ninth Circuit's strict-compliance standard but declined to define the "precise boundaries" for compliance. 24 F.4th at 715; *see id.* at 713. Then in *Sirois*, the First Circuit accepted the parties' agreed-on "substantial compliance standard" and concluded that the defendants failed to meet that standard. 119 F.4th at 152–53, 158–59. So at minimum, the First Circuit requires substantial compliance with state medical-marijuana laws to fall within the rider's protection. *Id.*

Stacy attempts to shoehorn his proposed reasonable-belief standard into the First Circuit's case law. But he merely warps the First Circuit's use of the word "reasonable" in a different context. In *Bilodeau*, the First Circuit commented that "the potential for technical noncompliance is real enough that no person through any *reasonable effort* could always assure strict compliance." 24 F.4th at 713 (emphasis added); *see Sirois*, 119 F.4th at 148 (same). That provides no support for adopting Stacy's reasonable-belief standard. At most, the quoted statement bolsters Stacy's position that we should reject a strict-compliance standard.

resolve the dispute here, because we conclude that Stacy failed to even substantially comply with Oklahoma's medical-marijuana laws. We review the conduct underlying each charge.

### 1.    Count One: Drug Conspiracy

For the drug-conspiracy count, Stacy allegedly conspired with others to manufacture, distribute, and possess with the intent to distribute marijuana. According to the indictment, Stacy helped non-residents evade Oklahoma's medical-marijuana laws. He crafted a two-entity business structure to obtain OMMA licenses and OBN registrations for these non-residents. He then added Oklahoma residents as "owners" to hide the non-residents' true ownership interests through the two-entity business structure. Though listed on the applications, these resident-owners had no relation to the marijuana-grow operations. Stacy also instructed clients that they could grow marijuana without the required OBN registration. Based on the evidence submitted at the hearing, the district court concluded that Stacy failed to substantially comply with Oklahoma law. Specifically, the district court determined that Stacy had violated sections 422(B), 427.14, 2-302, and 2-401. The first two sections list the requirements for an OMMA license, and the last two sections list the requirements for an OBN registration. §§ 422(B), 427.14, 2-302, 2-401.

On appeal, Stacy disputes the district court's ruling. First, Stacy asserts that his two-entity business structure complied with Oklahoma law. He claims that no Oklahoma statute required him to disclose the two-entity structure or to

35

disclose individuals "'involved' in or 'responsible' for the grow operation[.]" Op. Br. at 48. This argument misstates the law. To obtain an OMMA license, an applicant must "disclose all ownership interests[.]" § 427.14(E)(7)(e). Oklahoma law defines "owner" as a "direct beneficial owner," including "any other person holding an interest or convertible note in any entity which owns, operates or manages a licensed facility[.]" § 427.2(46). Stacy's operating companies fit this definition. In each of the two-entity business structures, the operating company "operate[d]" and "manage[d]" the licensed marijuana facility. *Id.* Stacy's failure to disclose the operating companies and their owners amounts to a failure to substantially comply with Oklahoma law.

Stacy resists this conclusion by arguing that he had "fully disclosed" the identities of the operating companies' owners, because the OMMA and OBN applications listed his out-of-state clients as 25% owners of the licensing companies. Op. Br. at 7. But even if we were to assume that the state agencies knew the identities of his out-of-state clients, Stacy's two-entity business structure still concealed their true ownership interests and involvement in the marijuana grows. So his failure to report the ownership interests of the operating companies violated section 427.14(E)(7)(e). *See also* § 427.14(E)(4), (K) (requiring that "[a]ll applications shall be complete and accurate in every detail" and that "[a]ll shall submit information . . . in a full, faithful, truthful and fair manner"). This violation alone demonstrates that Stacy failed to

36

substantially comply with Oklahoma's medical-marijuana laws.[16] But for a complete review, we consider his other arguments as well.

Second, Stacy argues that he "did not aid or abet" his clients' growth of marijuana prior to receiving their OBN registrations. Op. Br. at 51. This argument fails as well. Section 2-302(A) requires any entity that manufactures or distributes controlled substances (including medical marijuana) to "obtain a registration issued by the" OBN. But none of the operating companies in the two-entity structure even applied for an OBN registration. Nor could they obtain those registrations if they were to apply. The operating companies need OMMA licenses to obtain OBN registrations but do not meet the 75% residency requirement for the OMMA licenses. § 2-302(L) ("No person engaged in a profession or occupation for which a license to engage in such activity is provided by law shall be registered under [this act] unless such person holds a

---

[16] Stacy argues that Oklahoma later amended the law to require reporting "all ownership interests in the commercial grower operation." Op. Br. at 48 (emphasis omitted) (quoting Okla. Stat. tit. 63, § 422(B) (Nov. 1, 2021)). He claims that this amendment reflects how the prior version of the law never required disclosure of the operating company. This argument is unpersuasive, because section 427.14(E)(7)(e) had required disclosing the operating company and its owners before the cited amendment. *See Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 201 (5th Cir. 2017) ("[C]hanges in statutory language do not always constitute a change in meaning or effect of that statute. Rather, Congress may amend a law merely to make what was intended all along even more unmistakably clear." (citation modified)); *United States v. Lewis*, 67 F.3d 225, 230 n.8 (9th Cir. 1995) ("An amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." (citation modified)). Oklahoma's decision to clarify the illegality of certain business schemes does not render those schemes legal under the prior version of that law.

valid license of such person's profession or occupation."); § 427.14(E)(7)(c). Stacy's failure to register the operating companies violated Oklahoma law. § 2-302(A).

To avoid this outcome, Stacy asserts that the operating companies did not need to register with the OBN because they served as the licensing companies' agents. We disagree. Section 2-302(H)(1) carves out an exception to OBN registration for "[a]n agent . . . of any registered manufacturer, distributor, dispenser or user . . . if such agent is acting in the usual course of such agent's . . . business or employment[.]" And Oklahoma law defines "agent" as "an authorized person who acts on behalf of or at the direction of a person who manufactures . . . controlled dangerous substances[.]" Okla. Stat. tit. 63, § 2-101(2) (2019); *see* § 2-101(30) (defining "person" to include "any other legal entity"). Though Stacy claims that the operating companies fall within this exception, the evidence belies his assertion. The management agreement between the operating company and the licensing company states that the operating company is "an independent contractor" and that no provision "shall be construed to or shall create a relationship of agency . . . between the" operating company and licensing company. Supp. App. at 33. The agreement adds that the licensing company "shall not control or direct the manner or methods by which [the operating company] performs the [services] set forth in this [a]greement[.]" *Id.* The plain language of the agreement therefore counsels against an agency relationship.

38

Further, section 2-101(2) specifies that an agent "does not include . . . a person required to register under the Uniform Controlled Dangerous Substances Act[.]" The agent must also be "acting in the usual course of such agent's . . . business or employment" to qualify for the agency exception. § 2-302(H)(1). Here, the operating company's usual course of business is growing, cultivating, and distributing marijuana—activities that require OBN registration. The operating company therefore cannot qualify as an agent of the licensing company under sections 2-101(2) and 2-302(H)(1). And the evidence further reflects that, in practice, the Oklahoma residents—who compose at least 75% ownership of the licensing company—knew almost nothing about the marijuana operations. Supp. App. at 145, 156–57, 221–22. Under these circumstances, none of the operating companies served as agents of the licensing companies. Section 2-302(H)(1) offers no escape from OBN registration for the operating company.

Third, Stacy argues that he never aided any client's growth of marijuana before the licensing company obtained its OBN registration. He claims that an attorney "does not become liable for each and every misdeed a client may thereafter commit." Op. Br. at 52–53. But on at least one occasion, Stacy continued to advise his clients that they could grow marijuana without an OBN registration—*after* OBN's general counsel told him that this practice violated Oklahoma law. Supp. App. at 187–89. So even if we were to view these out-of-state clients through their roles as 25% owners of the licensing companies, the

39

record still demonstrates that Stacy aided his clients' marijuana growth before they obtained their OBN registrations.

Fourth, Stacy argues that his clients could legally grow marijuana without an OBN registration. He asserts that section 427.14 "required only that an applicant 'submit' (not obtain) a registration in order to be entitled to grow marijuana." Op. Br. at 54. He contrasts section 427.14 with section 2-302, which requires any individual who manufactures "controlled dangerous substances" to "*obtain* a registration" from the OBN. § 2-302(A) (emphasis added). Stacy claims that these two statutes conflict with each other and that the later-enacted statute—section 427.14—should control whether an individual needed to "obtain" or merely "submit" an OBN registration before growing marijuana. We disagree with this reading of the statutes. As discussed, section 427.14 lays out the requirements for an OMMA license, while section 2-302 lists the requirements for an OBN registration. Section 427.14's requirement that a license applicant also "submit" an application for OBN registration does not nullify section 2-302(A)'s requirement that an individual "obtain" an OBN registration before growing marijuana. *See* § 2-302(A) (requiring "[e]very person who manufactures . . . any controlled dangerous substance" to "obtain a registration issued by the [OBN]"); § 2-204. We see no conflict between these statutes that would require us to disregard section 2-302.

Finally, Stacy claims that Oklahoma's lax enforcement of these statutes created the false impression that growing marijuana before obtaining an OBN

registration complied with state law. But neither ignorance of the law nor lax enforcement justifies Stacy's failure to substantially comply with Oklahoma law. *See United States v. Benton*, 988 F.3d 1231, 1239 (10th Cir. 2021) ("[I]gnorance of the law is no defense."); *Sirois*, 119 F.4th at 156–57 (concluding that the state's lack of enforcement cannot overcome the defendant's failure to substantially comply with state medical-marijuana laws). Oklahoma's enforcement decisions—for reasons that may range from strategic planning to scarce resources—do not excuse noncompliance with the law.[17]

For these reasons, none of Stacy's arguments are persuasive. Stacy's conduct underlying the drug-conspiracy count demonstrates that he failed to substantially comply with Oklahoma's medical-marijuana laws. We therefore conclude that the district court did not abuse its discretion in declining to enjoin the prosecution of this count.

### 2.    Count Two: Maintaining Drug-Involved Premises

Besides the drug-conspiracy count, Stacy was also charged with maintaining drug-involved premises. For this count, the indictment alleges that Stacy knowingly and intentionally rented his property in Blanchard for an unlawful marijuana-grow operation. Stacy argues otherwise and submitted an audio recording in which he supposedly informed his tenants that they could

---

[17] For example, an OBN agent's stray comment about "growth before registration" as "an admin thing" cannot overcome Stacy's failure to substantially comply with the law. App. vol. III, at 17 (citation modified).

41

not grow marijuana without an OMMA license and OBN registration. The district court determined that Stacy had failed to meet his burden of proving his substantial compliance with state law.

On appeal, Stacy argues that the district court did not identify any alleged violation of Oklahoma law. He claims that no evidence established his knowledge of the tenants' marijuana-grow operations. The record contradicts this argument. In the grand-jury proceedings, Stacy's former tenant testified that Stacy knew about the unlicensed marijuana grow at the rental property. *See* Sealed Supp. App. at 4. Therefore, the district court could reasonably conclude that Stacy had knowledge of the illegal activity on his Blanchard property.

Stacy also argues that he functioned merely as an attorney and landlord. He points to his lack of ownership and lack of involvement in the operation. But his decision to rent property for the purpose of supporting an unlicensed marijuana grow violates Oklahoma law. Okla. Stat. tit. 63, § 2-404(A)(6) (2021) (prohibiting any person from keeping or maintaining any dwelling house or building that is used by others to keep or sell controlled dangerous substances in violation of the Uniform Controlled Substances Act); *see* § 2-401(A); Okla. Stat. tit. 21, § 172 (2021). The record establishes that Stacy was intimately involved with the unlicensed marijuana grow at his Blanchard property. *See* App. vol. VI, at 1 (lease agreement between Stacy Property Group L.L.C. and X Fortune Inc.); Sealed Supp. App. at 3–4 (testimony that the

42

tenants paid about $17,000 a month for a combination deal of rent and legal advice, that Stacy knew about the unlawful marijuana growth at the Blanchard property, that the tenants had paid Stacy to get a license, and that Stacy never got them a license). To counter these claims, Stacy cites (1) a recording of his conversation with his tenants at the Blanchard property; and (2) the lease agreement, which "required the tenant to comply with 'all applicable state and local laws . . . including but not limited to Oklahoma medical marijuana law.'" Op. Br. at 25 (quoting App. vol. VI, at 17). These arguments do not persuade us.

Even if we were to consider the recording, the overall record still supports a conclusion that Stacy failed to substantially comply with Oklahoma law.[18] For example, in the recording, someone—let's assume Stacy—incorrectly claims that Oklahoma's "rules" had "change[d]" and that the tenants must now have an active "Oklahoma partner" for their license. *See* Def. Ex. 122 at 01:37–02:05. At no point during the timeframe listed in the indictment did Oklahoma law "change," such that the tenants could previously grow marijuana without an OMMA license, obtain an OMMA license without the 75% residency requirement, or obtain an OBN registration without an OMMA license. We

---

[18] The district court concluded that the recording was not self-authenticating under Federal Rule of Evidence 902. On appeal, Stacy argues that the district court incorrectly ruled on this evidentiary issue. We need not resolve this dispute because the recording does not change the outcome of Stacy's appeal.

agree with the district court that "the recording does nothing to cast doubt on the allegation that Mr. Stacy rented his property with knowledge that the tenants wanted to grow marijuana, that the tenants subsequently operated a marijuana farm on the property, or that the tenants were selling marijuana without the required licenses." App. vol. II, at 15. As for the lease, we likewise find that a generalized statement about complying with state law cannot sufficiently counteract the evidence of Stacy's unlawful involvement in this marijuana grow.

For these reasons, we conclude that the district court did not abuse its discretion in declining to enjoin the prosecution of this count.[19]

## CONCLUSION

We affirm.[20]

---

[19] We note that the district court's factfinding does not affect the admissibility of evidence at any subsequent criminal trial. *See Bilodeau*, 24 F.4th at 716 n.9. This opinion also has no bearing on Stacy's guilt. We answer only whether the rider prohibits the funding of Stacy's prosecution.

[20] On appeal, the parties moved to seal certain portions of the record. Another panel of our court provisionally granted both motions. We see no grounds to disturb the rulings, because the sealed portions contain grand-jury testimony and personal identifying information. *See AdHealth, Ltd. v. PorterCare Adventist Health Sys.*, 135 F.4th 1241, 1244 n.1 (10th Cir. 2025); *In re Lynde*, 922 F.2d 1448, 1451–52 (10th Cir. 1991). So we affirm the provisional orders and will keep those portions of the record sealed. *SCO Grp., Inc. v. Int'l Bus. Machs. Corp.*, 879 F.3d 1062, 1086 n.25 (10th Cir. 2018). We deny as moot the government's request for an expedited decision.